MaynaRD, Special J.,
delivered the opinion of the Court.
This is a distressing picture of domestic life. The parties are shown to have been of irreproachable character, of high social position, surrounded with all that wealth can add to render home attractive; both reputable professors of the Christian faith; children and friends, theirs; to all outward observation, kind and affectionate in their intercourse, beyond the ordinary measure of conjugal regard;, they had passed ten years of wedlock, with nothing wanting, so far as could be seen, to complete happiness; yet they were far from being happy. With, or without cause, her confidence in her husband’s fidelity was shaken at an early period of their wedded life, by the birth of a mulatto *125 child. The suspicon, whether well founded or not, could not fail to he a perpetual annoyance to him, while to her womanly sensibilities it was the wound which never heals. On the contrary, either his gross and shameful misconduct, as she alleges, or the illusions of her own distempered fury, at a time of great physical prostration, as he more than intimates, brought a fresh occasion to her grief, which resulted in her leaving his home and taking refuge at the bedside of her aged and dying mother. This was in December, 1857. Twice, at his earnest solicitation, she returned, remaining each time a few weeks, and twice she went away, the last time on the 28th of April, 1858, and has gone back no more. In May, he went, with friends, to prevail on her to resume her place in his house; but without success. Having thus failed to regain his wife, the husband, in August folio-wing, brought into Court his original bill, praying for a divorce from the bonds of matrimony. Here begins this voluminous litigation, a melancholy series of crimination and recrimination. Bills, original, amended and supplemental, cross bills, answers in the nature of cross bills, and answers pure and simple, abound in the most serious accusations; charges of murder attempted by poison, of adultery, not with persons socially their equal, but with negroes, and the shame of their own race; misconduct less criminal indeed, but, if possible, more gross and offensive, are mutually made and mutually denied;. made with the sanction of an oath, and denied under the same responsibility. Scenes and relations which the natural modesty of our nature with *126 draws from view, are paraded with shocking publicity. Children are taught, as they grow up, to dishonor at least one of their parents. The tongue of scandal is let loose; and reputation's but lately too well established to be discussed even, are now the theme of jest and mockery among the low .and vile. It is a painful task to analyze and digest this record of unclean falsehood, and, if possible, attain unto a result that will, in some measure, protect these parties, and especially their children, from the consequences of their criminality and folly.
The basis of this application, is a charge that, on two occasions, she had attempted hi-s life by poison; once at his own house, and again after she had left, while on a visit seeking to reclaim her. In the following January, he submitted an amended bill, charging adultery with one Nilen, “and also with others;’3 and on the 30th of April, 1860, a supplemental bill, seeking a divorce on the ground of malicious and causeless abandonment and desertion, for a term of two full years. The original bill was not sworn to; the others were. Such charges by a husband, where, marital conduct had been almost ostentatiously tender and kind, and whose efforts at a reconciliation had been so earnest and apparently sincere, may well excite suspicion, if not awaken suspicion.. They are denied by her with great distinctness and impressive solemnity. To sustain the charge of poisoning, by far the grossest, there is not a particle of evidence. To disprove it, on the latter alleged occasion, the proof is full and satisfactory. There is testimony to the charge of adul *127 tery. Without discussing it here, it is enough that, so far from mating good the accusation, it creates a. disagreeable impression, that suborned perjury in the proof was resorted to, in support of perjury in the pleading. The charge of two years malicious absence is, under the circumstances, merely frivolous, and ought to have been dismissed by the Chancellor, on the demurrer. Hot inquiring at this point, whether she had; any cause for leaving her husband, she had been absent from him less than four months when his original bill was exhibited. To expect her to return to him while he was making and litigating with her issues, is a -proposition too monstrous for argument. All his hills will he dismissed.
In November, 1858, the wife answered her husband’s-original bill, and retorted charges of adultery by him with a servant, with a white girl named Lewis, “with various persons, and at various times;” of conduct oppressive and grossly improper, forcing her to withdraw from home, with such acts of indignity as rendered her connubial life intolerable. This answer, under a Statutory provision, was presented in the double aspect of a cross-bill, seeking herself a divorce, with alimony, and a provision for her support pending the litigation. In December following, she, by her next friend, offered her original bill, in the nature of a cross-bill - and a supplemental bill, re-affirming the allegations contained in her answer, and alleging, that, subsequently to her filing it, her husband, to defeat a recovery by her, had fraudulently conveyed his large estate to certain parties, who are also made defendants. When required *128 by the Chancellor to answer her husband’s supplemental bill, she introduced some further allegations of improper conduct, and, as by a cross-bill, renewed her prayer for a divorce and alimony. He made two answers. One responsive to his wife’s first answer, treated as a cross-bill, and also to her original bill; the other to her last answer replying to his supplemental bill. Excepting the matter of the property conveyances, of which more hereafter, every material allegation of hers is denied with great elaboration of detail, especially the charges of adultery with the negress and the girl Lewis, but insisting that if true, they were endorsed by' her voluntary return to his home and bed.
If the cause assigned for the divorce be adultery, it is a valid defense, if the defendant allege and prove that the complainant has admitted the defendant to conjugal society and embraces, after knowledge of the criminal act. The husband’s answer alleges, (and it is abundantly shown, that the wife, after all the acts of adultery of which she complains, or of which there is any evidence,) resumed connubial relations with him; indeed, that these relations were not finally suspended until the 28th of April, 1858, less than four months prior to the commencement of the litigation. The Court is thus spared the examination of much proof, direct and circumstantial, upon this issue, and the issues collateral to it, arising upon the credibility of witnesses. For this reason, she is entitled to no relief in this aspect of the case.
A wife may invoke the interposition of the law in her behalf, when the husband is guilty of such cruel *129 and inhuman treatment or conduct towards her, as renders it unsafe and improper for her to cohabit with him, and he under his dominion and control;; or has offered such indignities to her person as to render her condition intolerable, and thereby forced her to withdraw. It is shown that this husband had been guilty, and how often we can only conjecture, of denying the paternity of the first child born after the marriage, and since deceased. She makes the charge in her first and in her last answer. In his first reply he says': “It is not true, that he told her that one of the children was not his,” and makes no further allusion to the subject. His last reply avers that he “has no recollection of ever 'having charged that the child that was dead was not his, and is confident he never cfed make the charge previous to the time that she left him. It may be that after she left, and declared her determination of remaining away, and since he became convinced of her infidelity, that he did make the charge; but if he did, he has no recollection of it.” One of the witnesses thus testifies to a conversation in May, 1858, between the parties in the presence of several others, who fully corroborate the statement: “He was trying to get her to say that he had not mistreated her. He asked his wife if he had ever whipped • her; and I don’t know whether she answered his question or not. But my wife said to him, that there were many ways to mistreat a woman, without whipping her: she would rather a man would abuse her, than to throw up to her that one of her children was not his. Thomas denied it, and Mrs. Thomas *130 then said, ‘William, for God’s sake don’t deny that; for you will have to account for what you said; for you know you said that the child that is dead, was not yours.’ Thomas replied, ‘I did say it, hut it was for effect.’” What “effect” was designed, does not appear; nor whether this outrage had any connection with the comparison, which, in his first answer, he tells us, was instituted between the features of this deceased child and the mulatto child that occasioned so much trouble in the family.
It is shown that he attempted to induce one of his negro men to criminate his mistress in adultery with himself. Speaking of the matter to one of his neighbors, he said the reply of the negro was, “That if he had, his- mistress made him.” In the same conversation, he spoke of his wife in the language of the filthiest character. In this connection, much of the evidence touching his criminal intimacy with other women, is german, as showing the real state of his feelings towards his wife. The bills filed by him, and the gross and unfounded accusations made against her, illustrate the same thing. To the same effect is the regret expressed in his answer, that he had not governed her with a tight rein. Such conduct on the part of a husband, is reprehensible in the highest degree, and must be held to absolve the wife from her conjugal duties. A divorce from bed and board only, will be granted her. She will be allowed the several sums decreed by the Chancellor to her, out of the estate of her father, and the price for which the black girl, given by her father, and her *131 children, were sold, to be refunded by her husband and his securities. The counsel fees, both in this Court and the Chancery Court, will be paid by him. The residue of the distributive share in her father’s estate, and her bequest, under the Will of her mother, will be paid to her. The custody of the children will remain as heretofore;, the elder with the father, the younger with the mother. She is allowed as alimony, a semi-annuity of four hundred dollars, co-incident in time of payment, with the semi-annual terms of the Chancery Court at Blountville.
The charge in the wife’s original bill, that immediately after her answer had been made to the husband’s original bill, he conveyed all his property to his near relations, with a view fraudulently to defeat any recovery by her, is not seriously controverted by him, and is not answered by the other parties. 'He admits the conveyances as alleged, but insists that the object was not to defeat her, but her brother and next friend. As it is no where pretended that the brother contemplated any proceeding, except in. his sister’s behalf, it amounts to the same thing. These conveyances cannot stand. The alimony allowed will constitute a lien upon the property, embraced in them. The entire costs of the cause, in both Courts, will be paid by the husband and his respective securities, and the cause will be remanded to the Chancery Court, for the execution and enforcement of the decree.